STATE of Iowa, Appellee,

v.

Jay Thomas WIDMER–
BAUM, Appellant.

No. 01–1527.

Supreme Court of Iowa.

Nov. 14, 2002.

Philip B. Mears of Mears Law Office, Iowa City, for appellant.

Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant Attorney General, J. Patrick White, County Attorney, and David Tiffany, Assistant County Attorney, for appellee.

CADY, Justice.

In this appeal we must decide if the district court applied the correct time period within which a prisoner must be brought to trial under the Interstate Agreement on Detainers. We conclude the district court applied the incorrect

time period and the State failed to bring the prisoner to trial in a timely manner under the Interstate Agreement. We vacate the judgment and sentence, reverse the district court ruling on the motion to dismiss, and remand the case for dismissal of the underlying trial information.

## I. Background Facts and Proceedings.

On July 15, 1998, a criminal complaint was filed in Johnson County district court against Jay Widmer–Baum. The complaint accused Widmer–Baum of second-degree theft, based on a bad check scheme he allegedly engaged in during a five-month period the previous year. At the time the complaint was filed, Widmer–Baum was incarcerated in the State of Wisconsin. He was serving a sentence for a theft conviction in that state. Widmer–Baum was incarcerated at the Fox Lake Correctional Institution. The sentence was to expire on January 15, 2003.

On January 24, 2000, the Johnson County Attorney sent a notice of detainer and request for temporary custody of Widmer–Baum to the warden of the Fox Lake Correctional Institution. The detainer enumerated the Iowa charges against Widmer–Baum. The request for temporary custody indicated Widmer–Baum would be brought to trial in Iowa within the time specified in article IV of the Interstate Agreement on Detainers Act (IAD). The request was designated as form V, and specifically requested temporary custody of Widmer–Baum under article IV of the agreement. The form was signed by an assistant county attorney, and certified and recorded by the district court. The sheriff of Johnson County transmitted the form to the Fox Lake Correctional Institution with a cover letter. The cover letter indicated the form was enclosed, but stated:

Should the defendant decline to return to Iowa under the Interstate Agreement on Detainers, we will commence extradition proceedings upon his discharge from your custody.

Widmer–Baum was notified of the detainer. On February 7, 2000, he executed a response to the request for temporary custody (form I), declining to return to Iowa voluntarily. The form indicated Widmer–Baum was not requesting final disposition of the charges.

No further action occurred in the matter until almost one year later. On February 2, 2001, Widmer–Baum executed an "Offender's Notice of Place of Imprisonment and Request for Disposition of Indictments, Informations, or Complaints" (form II). The warden of the Fox Lake Correctional Institution also executed an "Offer to Deliver Temporary Custody" (form IV) of Widmer–Baum to Iowa officials for trial on the charges "described in the attached offender's request." The warden also executed a "Certificate of Offender Status" (form III) indicating Widmer–Baum was scheduled to be released from his sentence in six months, twenty-one days. These documents were received by the Johnson County Attorney on February 8, 2001.

On April 23, 2001, the Johnson County Attorney sent the warden of the Fox Lake Correctional Institution a "Prosecutor's Acceptance of Temporary Custody Offered in Connection With a Prisoner's Request for Disposition of a Detainer" (form VII). The acceptance indicated the Johnson County prosecutor would bring Widmer–Baum to trial within the time specified in article III of the IAD. Iowa authorities then took physical custody of Widmer–Baum from Wisconsin authorities and transported him to Johnson County on May 24, 2001.

On June 12, 2001, the Johnson County Attorney filed a trial information against

Widmer–Baum charging him with second-degree theft as a habitual offender. The district court set the trial for September 4, 2001.

On August 8, 2001, Widmer–Baum filed a motion to dismiss the trial information. He alleged the State failed to bring him to trial within the 180–day speedy trial provisions of the IAD. The district court denied the motion.

Widmer–Baum was found guilty of the charge in the trial information on August 30, 2001, following a bench trial. He was subsequently sentenced to an indeterminate period of incarceration not to exceed fifteen years.

Widmer–Baum appeals. He claims the time limitations for a trial under the IAD were triggered when the Johnson County Attorney received his request for disposition of the detainer on February 8, 2001, and that the district court erred by failing to dismiss the trial information against him after the State failed to bring him to trial before August 7, 2001.

## II.  Standard of Review.

Our review is for correction of errors at law. Iowa R.App. P. 6.4; *State v. Webb*, 570 N.W.2d 913, 914 (Iowa 1997).

## III.  Background.

■ The IAD is found in chapter 821 of the Iowa Code. Iowa Code §§ 821.1–.8 (2001). It is an agreement between forty-eight states, the District of Columbia, and the federal government that establishes uniform procedures for the orderly and cooperative disposition of criminal charges against a prisoner incarcerated in one jurisdiction and wanted by another jurisdiction that has lodged a detainer against the prisoner to respond to untried criminal charges in that jurisdiction.[1]  *Id.* § 821.1, art.  I. The IAD is implicated when a state or jurisdiction wants custody of a prisoner from another jurisdiction and files a detainer or written notice informing the jurisdiction in which the prisoner is serving a sentence to hold the prisoner so the second jurisdiction may try the prisoner for a different crime in its jurisdiction.  *United States v. Mauro*, 436 U.S. 340, 359, 98 S.Ct. 1834, 1846, 56 L.Ed.2d 329, 346 (1978); *State v. Wood*, 241 N.W.2d 8, 12–13 (Iowa 1976).[2]

■ A jurisdiction that lodges a detainer against a prisoner is generally not required to act on it.  *United States v. Dixon*, 592 F.2d 329, 332 n. 3 (6th Cir. 1979).  Historically, this has led to abuses

1.  Puerto Rico and the Virgin Islands also have joined the agreement. *See Commonwealth v. Davis*, 567 Pa. 135, 786 A.2d 173, 175 (2001) (citation omitted). Iowa became a signatory in 1965. *See* 1965 Iowa Acts ch. 445, at 845. Wisconsin is also a member state. *See* Wis. Stat. §§ 976.05, 976.06 (2001). The two states that are not members of the uniform compact are Louisiana and Mississippi. *See* 18 U.S.C.A. app.  § 1 (West 2000 & Supp.2002). A comprehensive history and background of the IAD can be found in *United States v. Mauro*, 436 U.S. 340, 349–52, 98 S.Ct. 1834, 1842, 56 L.Ed.2d 329, 340–41 (1978).

2.  The IAD does not define the term "detainer." *See Mauro*, 436 U.S. at 359, 98 S.Ct. at

1846, 56 L.Ed.2d at 346.  However, we have defined a detainer as " 'a notification filed with the institution in which a prisoner is serving a sentence, advising that [the prisoner] is wanted to face pending criminal charges in another jurisdiction.' "  *State v. Wood*, 241 N.W.2d 8, 12 (Iowa 1976) (citation omitted).  This definition was adopted from the federal definition. *See Mauro*, 436 U.S. at 359, 98 S.Ct. at 1846, 56 L.Ed.2d at 346 (citing House and Senate reports).  As a congressionally sanctioned interstate compact within the compact clause of article I, section 10, clause 3 of the United States Constitution, the interstate agreement is federal law subject to federal construction. *See New York v. Hill*,

of the detainer process, and the IAD is an attempt to eliminate these abuses. *See United States v. Ford,* 550 F.2d 732, 737–40 (2d Cir.1977). The purpose of the IAD is to expedite the "delivery of the prisoner to the receiving state" and to expeditiously dispose of the untried charges "prior to the termination of [the] sentence in the sending state." *Alabama v. Bozeman,* 533 U.S. 146, 148, 121 S.Ct. 2079, 2082, 150 L.Ed.2d 188, 192 (2001); Iowa Code § 821.1, art. I. This prompt action is needed to minimize the interruption and adverse impact of a foreign prosecution on the rehabilitation programs provided to the prisoner by the confining jurisdiction. *Bozeman,* 533 U.S. at 148, 121 S.Ct. at 2082, 150 L.Ed.2d at 192; *State v. Taylor,* 63 Conn.App. 386, 776 A.2d 1154, 1173 (2001); Iowa Code § 821.1, art. I. These programs help prisoners successfully integrate into society following release, and interruptions caused by the prosecution of a case may adversely impact the effectiveness of such programs.[3] The agreement attempts to discourage states and jurisdictions from lodging detainers against prisoners and then waiting until the release date before pursuing the underlying charge. *Wood,* 241 N.W.2d at 12.

■■■ The IAD is only invoked once a detainer is lodged. *Mauro,* 436 U.S. at 343–44, 98 S.Ct. at 1839, 56 L.Ed.2d at 336–37. The detainer, however, does not require the custodial member to produce the prisoner. Instead, it merely serves to notify the custodial institution that the prisoner is wanted in another jurisdiction, and activates certain requirements under the agreement. *Id.* Pursuant to the agreement, the authorities of the state or jurisdiction with custody of the prisoner are required to inform the prisoner of the source and contents of the detainer and the prisoner's right to request a final disposition of the underlying charge. Iowa Code § 821.1, art. III(c). At the same time, the agreement permits the requesting state to initiate the process for the prisoner to be transferred to the receiving state to stand trial. *Id.* § 821.1, art. IV. Thus, once a detainer is filed, either the prisoner or the receiving state can activate the procedures under the agreement to promptly dispose of the charge. These procedures are the central provisions of the IAD, and the timing of the speedy trial requirements under the provisions give rise to the issue presented on appeal.

■■■ If the prisoner institutes the process by requesting disposition of the charges pursuant to article III of the agreement, then the prisoner must be brought to trial within 180 days after written notice of the request has been delivered to the prosecutor in the appropriate court of the receiving state. *Id.* § 821.1, art. III(a); *Fex v. Michigan,* 507 U.S. 43, 52, 113 S.Ct. 1085, 1091, 122 L.Ed.2d 406, 416 (1993). The request by a prisoner under article III is considered to be a waiver of the right to contest extradition, as well as a consent to appear in any court necessary to effectuate the purposes of the IAD. Iowa Code § 821.1, art. III(e); *Cuyler v. Adams,* 449 U.S. 433, 445, 101

---

528 U.S. 110, 111, 120 S.Ct. 659, 662, 145 L.Ed.2d 560, 565 (2000).

**3.** The legislative history of the IAD detailed the adverse consequences of outstanding detainers:

[A] prisoner who has had a detainer lodged against him is seriously disadvantaged by such action. He is in custody and therefore in no position to seek witnesses or to preserve his defense. He must often be kept in close custody and is ineligible for desirable work assignments. What is more, when detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if ever, he will be in a position to employ the education and skills he may be developing. *State v. Batungbacal,* 81 Hawai'i 123, 913 P.2d 49, 52–53 (1996) (quoting S.R. No. 91–

S.Ct. 703, 710, 66 L.Ed.2d 641, 652 (1981). Thus, article III is a voluntary procedure under the agreement where the prisoner gives up the right to contest extradition in return for an assurance that the charge will be resolved within a period of 180 days.[4] *See Parker v. United States,* 590 A.2d 504, 510 (D.C.App.1991) (article III requires the prisoner to waive extradition rights).

■ Article IV of the agreement sets forth the procedures for the prosecutor of the requesting state to initiate the transfer of the prisoner. Under article IV, the prisoner may be returned pursuant to a request for temporary custody issued by the state where the charges are pending. Iowa Code § 821.1, art. IV(a). If the return is accomplished by this method, then the prisoner must be tried within 120 days of arrival in the receiving state. *Id.* § 821.1, art. IV(c). Thus, unlike the trigger for the 180–day period under article III, the 120–day period under article IV does not begin to run until the prisoner actually arrives in the receiving state.[5] Yet, the agreement does not provide any specific time within which the receiving state must complete the transfer after requesting temporary custody. *See Laster v. State,* 313 Md. 548, 546 A.2d 472, 478–79 (1988) (although the IAD "contemplates the timely transportation of the prisoner into the receiving state" after an article IV request by a prosecutor, the receiving state's "statutory obligation is [only] to bring the prisoner to trial within 120 days" after the prisoner has arrived in the state). Moreover, there is no specific requirement that the receiving state even effectuate the transfer by requesting temporary custody after a detainer is filed.[6] *Palmer v. Williams,* 120 N.M. 63, 897 P.2d 1111, 1115 (1995) ("no affirmative duty on a state under the IAD" to act on a detainer).

If the prisoner is not brought to trial within either the applicable time period prescribed in article III or article IV, the court where the charges are pending "shall enter an order dismissing [the charge] with prejudice," and the detainer shall have no force or effect. Iowa Code § 821.1, art. V(c). Additionally, the charges must also be dismissed "[i]f the appropriate authority shall refuse or fail to accept temporary custody" of the prisoner. *Id.*

---

1356, at 3 (1970), reprinted in 1970 U.S.C.C.A.N. (84 Stat.) 4864, 4866).

4. The time period may be extended because the agreement provides that a continuance may be granted for good cause. Iowa Code § 821.1, art. III(a) (2001).

5. One reason for the different triggering events between the speedy trial provisions of article III and article IV transfers is that article IV is an involuntary procedure while article III is a voluntary procedure. Consequently, the prisoner maintains the safeguards of the extradition process under an article IV transfer. *Cuyler,* 449 U.S. at 447–48, 101 S.Ct. at 711–12, 66 L.Ed.2d at 653–54. The exercise of the safeguards may consume time before the actual transfer can occur. Additionally, the governor of the sending state may disapprove a request for temporary custody during a period of thirty days after receipt of the request. Iowa Code § 821.1, art. IV(a).

6. The agreement only provides that the receiving state is entitled to have the prisoner "made available" for temporary custody upon presentation of a written request for temporary custody if the request is properly transmitted and a period of thirty days has expired within which the governor of the sending state may disapprove of the request. Iowa Code § 821.1, art. IV(a). In response to the request, the sending state must only then offer to deliver temporary custody of the prisoner to the receiving state. *Id.* § 821.1, art. V(a). The receiving state then may accept the offer of temporary custody by presenting appropriate documents to accomplish the transfer. *Id.* § 821.1, art. V(b).

To help implement the agreement, there are eight optional forms available for use by the authorities of the sending and receiving jurisdictions.[7] These forms were used by Iowa and Wisconsin officials in this case. A review of the forms reveals how the process works in practice.

Under article III, once a detainer is lodged, the warden of the prison uses form I ("Notice of Untried Indictment, Information or Complaint and of Right to Request Disposition") to inform the prisoner of the detainer and the right to request disposition. *Id.* § 821.1, art. III(c). If the prisoner elects to request disposition, then the prisoner signs form I and form II ("Inmate's Notice of Place of Imprisonment and Request for Disposition of Indictments, Informations or Complaints") and return the forms to the warden. The warden then sends form II, form III ("Certificate of Inmate Status") and form IV ("Offer to Deliver Temporary Custody") to the prosecutor and the appropriate court in the receiving state. *See id.* § 821.1, art. III(a), art. V(a). Upon receipt of the forms, the prosecutor in the receiving state completes form VII ("Prosecutor's Acceptance of Temporary Custody Offered in Connection With a Prisoner's Request for Disposition of a Detainer") and sends it to the warden. The prosecutor then completes form VI ("Evidence of Agent's Authority to Act for Receiving State") and sends it to the state agreement administrator.[8] Form VI shows the date the prisoner will be transported.

Under article IV, once a detainer is lodged and the prosecutor in the member state desires temporary custody of the prisoner, the prosecutor completes form V ("Request for Temporary Custody") and sends it to the prisoner and the warden. After the thirty-day period for the governor to deny the request, the warden sends form III ("Certificate of Inmate Status") and form IV ("Offer to Deliver Temporary Custody") to the prosecutor of the receiving state. *See id.* § 821.1, art. IV(b), art. V(a). Upon receipt of the forms, the prosecutor completes form VI ("Evidence of Agent's Authority to Act for Receiving State") and forwards it to the state agreement administrator. This form shows the date the prisoner will be transported.

## IV. Competing Time Limitations.

▇▇▇▇ The State claims the transfer process was accomplished under article IV, while Widmer–Baum claims it was done under article III. In considering competing or overlapping requests under article III and article IV, we apply a rule that "the first party to perfect the compact request, be it the state or the prisoner, is entitled to proceed according to the article of the compact under which that request is made." *Webb,* 570 N.W.2d at 915.

In this case, the State made its request for temporary custody under article IV nearly a year prior to the time Widmer–Baum made his request for disposition under article III. Thus, the State was first to perfect.[9] Applying our rule in *Webb,* the

7. The forms are published in The Council of State Government, *The Handbook on Interstate Crime Control* 100–09 (rev. ed.1966). This handbook also contains instructions for the use of the forms. *Id.* at 110–14; *see also Laster,* 546 A.2d at 474 n. 2.

8. Under section 821.7, "the governor is ... authorized to designate an officer or alter-

nate" to serve as the administrator of the agreement. Iowa Code § 821.7.

9. Widmer–Baum did not argue before the district court or raise in his final brief on appeal that the State failed to perfect its article IV request because the cover letter sent with the request indicated the State did not intend to act on the detainer until Widmer–Baum was discharged from his sentence, unless he

district court found Widmer–Baum was timely tried pursuant to the 120–day time limitation established under article IV of the compact because the period of limitations did not commence until Widmer–Baum arrived in Iowa on May 24, 2001.

It is important to recognize that our rule in *Webb* does not merely look to the first party to make the request after the detainer is lodged to determine the proper speedy trial time frame to apply. Under our rule, the first party to perfect the request "is entitled to proceed according to the article of the compact under which that request is made." *Id.* at 915. This means the first party to perfect is entitled to complete the process it started. Yet, the rule does not prevent the other party from requesting transfer. Moreover, the rule does not prevent the first perfected party from waiving its right to proceed under its request and elect to proceed under a subsequent request by the other party. Thus, the inquiry to determine the applicable time limit not only considers which party was first to perfect a request, but also considers under which article the parties proceeded following a request. *See Last-*

er, 546 A.2d at 479 (the question is whether "the IAD proceeding ... was pursuant to a prisoner demand for disposition or [the receiving state's] request for temporary custody").

In this case, the State may have been the first party to perfect a request under article IV, but the facts reveal the State elected to proceed pursuant to the second request made by the prisoner under article III nearly one year later. Wisconsin authorities did not respond to the State's request and there was no further action by the State until Widmer–Baum made his request for disposition under article III by completing form II.[10] The warden then sent form II, form III, and form IV to Iowa authorities. At this point, the State did not insist that the transfer proceed under its prior article IV request. Instead, the State responded to the warden by submitting form VII. This form specifically provided that Iowa was accepting the offer created by the prisoner's request for disposition of the detainer. It also provided that Widmer–Baum would be tried "within the time specified in article III(a) of the agreement on detainers." Further-

would return voluntarily. Therefore, we do not address this question.

10. The IAD provides that charges shall be dismissed and the detainer nullified "[i]f the appropriate authority shall refuse or fail to accept temporary custody" of a prisoner. Iowa Code § 821.1, art. V(c). Widmer–Baum did not argue that the State's inaction in this case during the one-year period following its request for temporary custody constituted a refusal or failure to accept custody. Instead, he argued the State abandoned its request by failing to pursue it, which rendered it a nullity and allowed him to perfect his request first. The State argued in response that the delay was solely attributable to the negligent failure of Wisconsin authorities to respond to its request for temporary custody, and such negligence cannot support abandonment because it was unable to complete the transfer of custody until Wisconsin

authorities responded to its request as they were required under the agreement.

We need not decide if the State abandoned or waived its request, or what obligation the State may have had after Wisconsin authorities failed to respond to its article IV request for custody, because the record clearly shows the parties proceeded under the article III request by Widmer–Baum, not the earlier article IV request by the State. However, we *note the record reveals the cover letter sent to* the prison warden in Wisconsin along with the article IV request expressly said that if Widmer–Baum did not agree to voluntarily return to Iowa, Iowa would use extradition to bring him to Iowa after he was discharged. Thus, the cover letter contradicted form V and provides an explanation why Wisconsin authorities may not have responded with a form IV offer to deliver custody.

more, there is no evidence to show any of the procedures under article IV were followed, such as allowing the governor of Wisconsin an opportunity to disapprove of the transfer. Thus, the process followed by the parties to accomplish the transfer mirrored the process set forth in article III, and revealed Iowa elected to proceed under article III instead of article IV. Consequently, the time limits of article III governed the transfer. The State waived any ability to proceed under its prior article IV request by accepting Widmer–Baum's offer to return under article III, and Widmer–Baum "gained the right to be tried within the 180 day period prescribed in Article III." *Laster*, 546 A.2d at 479.

The IAD provides that the indictment "shall" be dismissed if the prisoner is not brought to trial within 180 days of the time the receiving state receives the prisoner's IAD request, absent good cause for a continuance. Iowa Code § 821.1, art. III(a), art. V(c). This provision constitutes an express mandate. *See Bozeman*, 533 U.S. at 153, 121 S.Ct. at 2084–85, 150 L.Ed.2d at 195 (use of word "shall" in the IAD is absolute). It means, absent a continuance or waiver, the charges must be dismissed with prejudice if a prisoner is not brought to trial within the prescribed time period.

The district court erred in applying the 120–day time limit under article IV. Under article III, Widmer–Baum was not tried within 180 days from the time the State received his request for disposition of the charges. Additionally, the State did not request a continuance beyond the 180–day time period, nor was there any evidence of good cause presented before the district court to support a continuance. Consequently, Widmer–Baum was entitled to have the trial information dismissed. This remedy is consistent with the purposes of the compact, and was known to the com-
pact members when they joined the compact.

## V. Conclusion.

We conclude the 180–day time period under section 821.1, article III applied to this case, and the district court erred by failing to dismiss the trial information prior to trial. We vacate the judgment and sentence, reverse the decision of the district court, and remand the case to the district court to enter an order dismissing the trial information with prejudice.

**JUDGMENT AND SENTENCE VACATED, DISTRICT COURT DECISION REVERSED, AND CASE REMANDED.**